Filed 7/10/14  P. v. Williams CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DEREK KINON WILLIAMS,<br><br>    Defendant and Appellant. | B246946<br><br>(Los Angeles County<br>Super. Ct. No. MA057109) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge.  Affirmed.

Ann Krausz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General,  James William Bilderback II and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Derek Kinon Williams, appeals his conviction for criminal threats (2 counts), with prior serious felony conviction findings (Pen. Code, §§ 422, 667, subds. (a)-(i)).[1] He was sentenced to state prison for a term of 12 years and 4 months.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

On August 13, 2012, defendant Williams and his friend, Charlette Vigil, were parked on Barrell Springs Road in Palmdale while listening to music in Vigil's car. They were in an isolated area that had no lights and was surrounded by Joshua trees and brush. Police officers routinely patrolled this area at night because it is a place where people consume drugs and commit various crimes.

About 9:00 p.m., Los Angeles County Sheriff Deputies Gustavo Munoz and Robert Hawkins were on patrol when they noticed Vigil's car. They pulled up behind it and exited their patrol car. While Munoz made contact with Vigil, who was in the driver's seat, Hawkins approached Williams, who was in the front passenger seat. Hawkins asked Williams if he were on probation or parole. When Williams said he was on parole, Hawkins had him step out of the car for a parole compliance search. While Hawkins conducted a pat-down search, Williams became agitated and complained Hawkins was violating his rights.

After the pat-down search, Hawkins handcuffed Williams and put him into the back seat of the patrol car while Vigil's car was searched. Hawkins sat in the front seat of the patrol car and determined, by means of an on-board computer, that

---

[1] All further references are to the Penal Code unless otherwise specified.

Williams was on parole for having made criminal threats. Hawkins testified Williams "was . . . very irate, very loud, yelling, saying that we were violating his rights." Williams called Hawkins a "peckerwood," a racial slur for a white person.

Meanwhile Vigil, who had consented to a search of her car, was also placed into the back of the patrol car although she was not handcuffed. Munoz and Hawkins searched her car and, finding no criminal evidence, decided to release Vigil and Williams.

Williams was uncuffed and told he was free to go. Nevertheless, he kept screaming at the deputies belligerently. Vigil walked back to her car, but Williams stood by the patrol car and kept yelling. Munoz testified Williams said, " 'You'll be humble mother fuckers if I caught you off duty,' or, 'If you weren't in uniform,' or something along those lines." When Munoz told Williams he could go to jail if he made threats, Williams replied: "I'll fuck you up, I ain't afraid to go back to prison." Munoz testified that "[b]ased on [Williams's] demeanor, him screaming and threatening to fight us, we were kind of concerned that the altercation was going to get physical."

The deputies and Vigil were telling Williams to get back into Vigil's car. Williams began walking in that direction, but then he turned around, pointed at the deputies and said: "I hope I catch you guys off duty. I'll fucking kill you." Hawkins testified Williams's voice had become "a little bit quieter than [his] previous statements" and "it was more of a deliberate statement than just loud shouting." The deputies responded by arresting Williams.

At trial, both deputies testified that, due to Williams's statement and his conduct, they were afraid for their individual safety as well as for the safety of their families. The deputies lived in the same area where they worked, and they were concerned Williams would be able to find them off duty and harm them. Munoz testified:

3

"Q. And what's going on in your mind when [Williams] said those things?

"A. It was a combination of things. . . . [W]hen he specifically made that threat to catch us off duty and kill us, it was just based on the fact . . . he was already on parole for criminal threats, based on his behavior, that he was standing there arguing with us, threatening to fight us, threatening to kill us while we're in uniform, with a gun, with a vest, the two of us.

"And then couple[d] with the fact that I live out here, my partner lives out here in the City of Palmdale. [Williams] specifically said 'off duty,' so off duty most of the time . . . I'm not equipped with a vest, with a gun belt, with any kind of equipment, any radio. And half the time I'm with family, whether it's my mom, my dad, my girlfriend.

"And coupled with all that, and also the fact that he told me he's not afraid to go back to prison, I was in fear that . . . if he did find me off duty there's a possibility that he would do something."

Hawkins similarly testified he was afraid for the safety of himself and his family:

"Q. So at this point when he said that he hopes to catch you guys off duty, and that he'll kill you, what's going on in your mind?

"A. First thing that I was thinking is being in the area, I live locally, spend a lot of time in Antelope Valley, and the first thing that crossed my mind is being off duty with my family and running into the defendant. And also the station, Palmdale Station where I work . . . it's public knowledge where the station is, it would be easy to see Deputy Munoz or myself coming and going, find our vehicle, license plate, follow us, things like that were going through my head at this time."

4

2. *Defense evidence.*

Vigil testified that when the deputies pulled up behind her car, Williams got out and announced he was on parole. The deputies then "grabbed him and . . . pushed him against the car." Williams was irate and swearing at the deputies, who put Vigil and Williams into the patrol car and began searching Vigil's car without asking her permission. The deputies dumped out the contents of her purse, broke the glove compartment, and emptied boxes onto the car floor.

Vigil testified that after the deputies said they were free to go, Williams still "had an attitude, and he told them fuck you, and they told him . . . you don't need to talk like that or whatever, sir. And he's like, 'Fuck you. I ain't afraid to go back to jail.' And that's when [the deputies] grabbed him and they handcuffed him again and took him to the [patrol] car." Vigil testified she did not hear Williams threaten to kill the deputies.

## CONTENTIONS

1. The trial court erred by failing to instruct the jury on attempted criminal threats as a lesser included offense.

2. There was *Pitchess* error.

## DISCUSSION

1. *Failure to instruct on lesser included offense.*

Williams contends the trial court erred by failing to instruct the jury, sua sponte, on attempted criminal threats as a lesser included offense. This claim is meritless.

a. *Legal principles.*

"In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the

5

threat – which may be 'made verbally, in writing, or by means of an electronic communication device' – was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)

"[A] defendant can be found to have committed *the crime of attempted criminal threat* only if he or she acts with the specific intent to make the very kind of threat – that is, a threat that 'on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened as to convey a gravity of purpose and imminent prospect of execution' – to which section 422 applies. If a defendant acts with such a purpose, but is thwarted from completing the crime by some fortuity or unanticipated event, imposing criminal liability upon the defendant for attempted criminal threat in no way will undermine the legislative purpose of prohibiting threats of the specific nature and severity of those identified in section 422." (*People v. Toledo, supra,* 26 Cal.4th at p. 232, italics added.)

"When there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of a lesser included offense, the court must instruct upon the lesser included offense, and must allow the jury to return the lesser conviction, even if not requested to do so." (*People v. Webster* (1991) 54 Cal.3d 411, 443.) "An offense is necessarily included within a charged offense 'if under the statutory definition of the charged offense it cannot be committed without committing the lesser offense, or if the charging allegations of the accusatory pleading include language describing the offense in such a way that if committed as specified the lesser offense is necessarily committed.' [Citation.]" (*People v. Toro*

6

(1989) 47 Cal.3d 966, 972, disapproved on other grounds by *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3.)  "[A] trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence.  On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)  " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]" ' that the lesser offense, but not the greater, was committed.  [Citations.]  [¶]  In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (*Ibid*.)

"[O]n appeal we employ a de novo standard of review and independently determine whether an instruction on the lesser included offense . . . should have been given." (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.)  "[I]n a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v. Watson* (1956) 46 Cal.2d 818, 836]. A conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred [citation]." (*People v. Breverman, supra,* 19 Cal.4th at p. 178, fn. omitted.)

b. *Discussion*.

Williams contends the trial court was required to instruct the jury on attempted criminal threats because the evidence suggested his statements had not actually or reasonably caused the deputies to be afraid:  "[C]onsidering to whom the statement was made, and the context under which it was said, the jurors might have entertained a reasonable doubt as to whether the threat *actually* caused the deputies to be in reasonable sustained fear . . . ."  We disagree.

7

Williams acknowledges both deputies testified they feared for themselves and their families when he told them, "I hope I catch you guys off duty. I'll fucking kill you." However, he argues, the deputies perform a dangerous job and are trained to deal with potentially violent persons: "Given the nature of their chosen profession, the statement could not have had as frightening of an impact as if made to non-deputies. Indeed, it is inconceivable that an altercation of this type was their first. Both Munoz and Hawkins acknowledged that their profession is dangerous and that they have been trained to deal with confrontations of this kind. They further testified that they frequently ran into people they had arrested or had had confrontations with and, as a result, carried a gun with them most of the time when off duty." Williams asserts: "Just based on their profession, a reasonable, properly instructed jury, may have concluded that an attempt took place but that the crime of criminal threats had not been completed."

Williams's suggestion the prosecution should be held to a higher standard of proof because the victims were police officers is not persuasive. Section 422 protects both police officers and ordinary citizens from criminal threats. (See *People v. Schnathorst* (2004) 120 Cal.App.4th 1310, 1315-1316 [rejecting defendant's claim section 422 does not extend to threats made against police officers].) Williams does not cite any authority holding police officers should be held to different subjective standards than ordinary citizens when faced with criminal threats.

Williams relies on *In re Alejandro G.* (1995) 37 Cal.App.4th 44, a "fighting words" case (§ 415, subd. (3)), which reasoned police officers were expected to exercise a higher degree of restraint than the average citizen when faced with verbal abuse. (*Alejandro G.* at pp. 49-50.) But section 415, subdivision (3), merely prohibits the use of "offensive words in a public place which are inherently likely to provoke an immediate violent reaction." And all the minor in *Alejandro G.* did was

8

challenge a police officer to fight while using some pretty strong swear words.[2] There is a fundamental difference, however, between challenging an officer to fight and threatening to kill him.

Williams also argues there was substantial evidence Munoz and Hawkins were not actually frightened by his threat. He points out the deputies did not react when he said he would "fuck them up," and that they later uncuffed him right after he said they would be "humble motherfuckers" if he caught them off duty. But this merely demonstrated the deputies were properly cognizant "that the statute 'was not enacted to punish emotional outbursts, it targets only those who try to instill fear in others.' [Citation.] In other words, section 422 does not punish such things as 'mere angry utterances or ranting soliloquies, however violent.' [Citation.]" (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 861.) It was not until Williams escalated his bad behavior by making an explicit death threat that the deputies arrested him.

Williams questions the deputies' ultimate decision to arrest him: "After all the statements made by appellant, it is simply not reasonable to conclude that it was the final statement that caused two experienced and armed deputies reasonable and sustained fear. Rather, the deputies' actions support a conclusion that they realized that appellant was venting his frustration." But this ignores Deputy Hawkins's testimony that something had changed in Williams's demeanor and he seemed to be moving beyond mere bluster. Hawkins testified:

---

[2]     The confrontation in *Alejandro G*: "As [Officer] Stevens was handcuffing Parraz, Alejandro said, 'You ain't taking my uncle, mother fucker.' Stevens ignored Alejandro and continued handcuffing Parraz. Alejandro then said, 'Hey, punk ass mother fucker, take off that gun and badge, and I'll kick your ass.' Stevens again ignored Alejandro and finished handcuffing Parraz. At that point, Alejandro said, 'Come on. Come on, me and you. Come on, man, me and you.' Stevens then walked over to Alejandro and said, 'Are you challenging me to a fight?' Alejandro responded, 'Fuck yes,' at which point Stevens arrested him for challenging him to fight." (*In re Alejandro G., supra,* 37 Cal.App.4th at p. 47.)

9

"Q. And what was going through your mind at this point?

"A. He . . . was threatening, but more threatening to fight, to cause an altercation there. That's something that in law enforcement happens, not on a daily basis but on a fairly regular occasion where someone will be agitated and say that they are going [to] fight with you, that they don't have any respect for you, those kind of things.

"Q. So at that point you hadn't made a decision to arrest him; is that right?

"A. No, actually following that we again ordered him to return to his vehicle.

. . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . .

"Q. Okay. Did he say anything?

"A. He did.

"Q. What did he say?

"A. At that point he said, 'I hope . . . I catch you guys off duty. I'll fuckin' kill you.'

"Q. And how did he say it?

"A. At that point . . . he was still loud, but he was a little bit quieter than the previous statements that he had made, like . . . it was more of a deliberate statement than just loud shouting."

And Deputy Munoz testified:

"Q. So do you arrest all those people who curse at you and who are shouting at you and using foul language?

"A. No.

"Q. How come?

"A. Screaming, cursing, being unpolite [*sic*], being unprofessional, having an altitude [*sic*], it's not illegal. It's . . . not illegal.

"Q. Okay. So, but in this case you did arrest Mr. Williams; right?

"A. Yes.

10

"Q. And why did you arrest Mr. Williams?

"A. It was the combination of things as far as from his criminal history and the threat that he made, saying when he catches us off duty he's going to kill us. And that was my concern."

We conclude there was no substantial evidence warranting a sua sponte instruction on attempted criminal threats as a lesser included offense. "[T]he existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed. [Citations.] [¶] *In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury*." (*People v. Breverman, supra,* 19 Cal.4th at p. 162, italics added.) Here, there was no affirmative evidence tending to show the deputies had not experienced reasonable fear. There was, merely, the possibility the jury might have doubts about their testimony and Williams is essentially asking us to second guess the jury's verdict.

The trial court did not err by failing to instruct on attempted criminal threats as a lesser included offense.

2. *Review of in camera <u>Pitchess</u> hearing.*

Williams has asked us to review the trial court's ruling on his motion seeking discovery under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531. Our review of the in camera hearing reveals no abuse of the trial court's discretion. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1232.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:


KITCHING, J .


ALDRICH, J.